1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  KERRY L. LEICK,                    )
                                       )        2:07-cv-49-GEB-DAD
12                    Plaintiff,       )
                                       )
13       v.                            )        ORDER
                                       )
14  HARTFORD LIFE AND ACCIDENT         )
    INSURANCE COMPANY aka THE HARTFORD,)
15                                     )
                      Defendant.       )
16  _____ )

17

18            Plaintiff and Defendant filed cross motions under Federal

19  Rule of Civil Procedure ("Rule") 52 for judgment on the administrative

20  record of this Employee Retirement Income Security Act ("ERISA")

21  action.  Plaintiff contends Defendant, who administers Plaintiff's

22  long-term disability insurance policy, improperly denied long-term

23  disability benefits.  Defendant counters that Plaintiff's medical

24  condition does not render her "totally disabled" and therefore she is

25  not entitled to disability benefits.  This Order constitutes the

26  findings of fact and conclusions of law required by Rule 52.

27  ///

28  ///

                                    1

## STANDARD OF REVIEW

Defendant's decision to deny disability benefits is reviewed de novo.  See Johnson v. Buckley, 356 F.3d 1067, 1075 (9th Cir. 2004) (holding that the denial of long term disability benefits is reviewed de novo unless the insurance policy gives the administrated discretion).[1]  In ruling on cross motions for judgment under Rule 52 and "conduct[ing] a de novo review of an administrator's denial of a long-term disability benefits in an ERISA case, the Court effectively conducts a bench trial upon the record." Allenby v. Westaff, Inc., 2006 WL 3648655, at *1 (N.D. Cal. Dec. 12, 2006) (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999)).

"On de novo review, the Court may weigh contradictory evidence." Hyder v. Kemper Nat'l Servs., Inc., 2006 WL 1821230, at *7 (N.D. Cal. June 30, 2006) (citing Newcomb v. Standard Ins. Co., 187 F.3d 1004, 1007 (9th Cir. 1999)).  When "[it] must [be] decide[d] [] whether Plaintiff is disabled under the terms of the plan[,] . . . Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan . . . ." Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) (citing Juliano v. Health Maint. Org. of N.J., Inc., 221 F.3d 279, 287-88 (2nd Cir. 2000)).

## FINDINGS OF FACT

1.  Plaintiff was a participant in a long term disability plan insured by a group disability income policy ("the Policy") issued by Continental Casualty Company.  (Decl. of Juan M. Mendez ("Mendez Decl."), Ex. B. ("Admin. Record") at AR977, AR984.)

---

[1]     Defendant does not dispute that the de novo standard of review applies.  (See Def.'s Mot. at 8:7-28.)

2.  Plaintiff, who worked as a material handler at Ace Hardware until October 1991, submitted a claim in April 1992 for long term disability benefits due to Chronic Fatigue Syndrome. (Id. at AR980-87.)  The Continental Casualty Company approved Plaintiff's claim and paid Plaintiff disability benefits.  (Id. at AR932-33.)

3.  The Policy provides disability benefits in the event Plaintiff is "Totally Disabled," which means:

> [B]ecause of Injury or Sickness, the Insured Employee is:
> (1) continuously unable to engage in any occupation for which [she] is or becomes qualified by education, training or experience; and
> (2) under the regular care of a licensed physician
> . . . .
> (Mendez Decl., Ex. A at POL020.)

4.  The Social Security Administration found Plaintiff disabled in 1991 and continues to provide Plaintiff with Social Security disability benefits. (Admin. Record at AR874-77.)  In 1995, the Department of Social Services conducted a disability evaluation during which Plaintiff was examined by Dr. Dale Ando.  (Id. at AR623-27.)  Dr. Ando diagnosed Plaintiff with Chronic Fatigue Syndrome and stated that Plaintiff has "symptoms of severe fatigue, joint pains, myalgias and body pain . . . [and] has undergone extensive evaluation to rule out rheumatic disease and chronic infectious disease or other endocrine abnormalities as the cause for her chronic fatigue syndrome." (Id. at AR626.)  Dr. Ando stated that Plaintiff should be limited to carrying up to twenty pounds on an occasional basis only, but noted "[t]here are no limitations for sitting, walking, standing or specific physical activities." (Id. at AR627.)

///

///

5.   In December 2003, Defendant acquired and thereafter administered disability claims under the Policy, including Plaintiff's claim.  (Mendez Decl. ¶ 1.)

6.   Plaintiff submitted a claim form in July 2004 reporting that "[t]here hasn't been much change in how [she] feel[s], [and she] ha[s] learned to pace [her]self in [her] daily activities."  (Admin. Record at AR440.)  She stated that her daily activities included doing dishes, making her bed, "afternoon chore," laundry, and vacuuming. (Id.)  She also stated that she does not believe she can return to her former occupation, but that she "started taking some computer classes at [her] own pace."  (Id.)

7.   Plaintiff's treating physician, Dr. Kenneth Lee ("Dr. Lee"), has been treating Plaintiff since at least 1992.  (See id. at AR810.)  In July 2004, Dr. Lee reported his diagnosis that Plaintiff suffered from Chronic Fatigue Syndrome.  (Id. at AR441.)  This diagnosis was based on "subjective symptoms" which were "persistent debilitating fatigue, myalgias, arthralgia," but "[l]ab tests [were] normal."  (Id.)  Dr. Lee also reported that Plaintiff had experienced "[n]o significant improvement in Chronic Fatigue Syndrome," and that Plaintiff was "[u]nable to carry out sustained activity at this point[, but] [i]f [Plaintiff's condition] improves in [the] future, vocational rehab[ilitation] might be a possibility."  (Id. at AR442.) Dr. Lee checked the "yes" box next to the question "is patient now totally disabled?"  (Id.)

8.   Plaintiff worked as a volunteer on a limited basis at a hospital gift shop, but was "consistently absent" from her volunteer position "due to health reasons."  (Id. at AR277.)  According to Plaintiff's supervisor, "these absences usually occur after she has

volunteered on two consecutive days or given more than 16 hours in one week." (Id.)

9.  Plaintiff took beginner computer classes from January to September 2003. (Id. at AR406.)

10. During March 2005, Plaintiff was treated at the hospital for a broken foot which she sustained from a fall while bicycling with her granddaughter. (Id. at AR388.)

11.  Defendant's investigators conducted surveillance of Plaintiff during June and July 2005. (Id. at AR135-147.)  On June 1, surveillance demonstrated Plaintiff did not leave her home.  (Id. at AR087.)  On June 5, the investigator watched Plaintiff's home beginning at 5:42 a.m., but Plaintiff was not observed until she left her home at 2:42 p.m. (Id. at AR141.)  Plaintiff was seen driving, visiting a private residence for approximately forty minutes, pumping gas, getting in and out of her car, purchasing a "few items" at an "AM/PM" store, and visiting a friend at a resort.  (Id. at AR137.) The investigator noted that Plaintiff "appeared to ambulate normally throughout the day." (Id.)  On June 24, Plaintiff did not leave her home.  (Id. at AR087.)  On June 25, Plaintiff was seen retrieving items from a mobile camper parked in her driveway at 4:19 p.m.; she carried those items into her garage and drove away in her car.  The investigator lost sight of her vehicle in traffic.  (Id. at AR147.) On June 26, Plaintiff was seen returning home after approximately two hours away from her house, and the investigator observed her "carrying a large bag in one hand . . . ."  (Id.)

12.  On July 25, 2005, one of Defendant's investigators interviewed Plaintiff at her home for nearly seven hours.  (Id. at AR398-410.)  The interview lasted six and three-quarters hours, during

which time Plaintiff was "able to sit in one position for approximately 20 minutes" at a time, "constantly shifting in her chair." (Id. at AR399.)  Plaintiff also "got up from time to time to walk, stretch, and use the bathroom facilities, eat and to smoke two cigarettes outside." (Id.)  Although the interviewer noted that Plaintiff "appeared to have no problems with her short/long term memory," Plaintiff's "daughter helped her with a few of the functionality answers." (Id.)  Plaintiff told the interviewer that "her ability to stay focused or to concentrate has [been] greatly diminished by [taking] medication." (Id.)  Plaintiff said she "seems to forget things more easily, and is not able to concentrate because of the extreme weakness caused by her chronic fatigue." (Id.)

13. Plaintiff signed a statement which stated, *inter alia*, that: (1) she is able to sit for fifteen minutes at a time, after that her body is "stiff and achy"; (2) she is able to drive for an hour before she needs to stop and rest; (3) she is able to stand no more than five minutes at a time; (4) she is able to walk one quarter mile before she becomes exhausted; (5) her pain level on a good day is a four and on a bad day is a ten (with zero being no pain and ten being extreme pain); (6) the number of bad days she has during a week is four; (7) she is able to perform household chores including "light cooking at [her] own pace," light dusting, changing the sheets once a week, vacuuming twice a month, laundry once a week, mow her grass, wash her car, and water her plants. (Id. at AR401-05.)  Plaintiff stated that the day of the interview was good day for her. (Id. at AR406.)  On a good day, Plaintiff stated, she is able to "go out and run errands . . ., visit friends and go to the store . . .," but on a bad day, she is "too exhausted to go out and [she] stay[s] home all

day." (Id. at AR405.)  Plaintiff also stated that "[t]here are no accommodations that can be made which would allow [her] to return to work" and "[she] is not able to do any kind of work for a whole day without it being interrupted by [her] lack of energy." (Id. at AR406.)

14.   Defendant obtained an independent medical report from Dr. Joseph Tuthill ("Dr. Tuthill"), who is a "Diplomate, American Board of Internal Medicine." (Id. at AR345.)  Dr. Tuthill based his opinion on the surveillance report, the interview report, Plaintiff's medical records and a conversation with Plaintiff's own physician, Dr. Lee. (Id. at AR342.)  Dr. Tuthill concluded that Plaintiff "appears to have a valid diagnosis of [Chronic Fatigue Syndrome] [but] [n]o objective findings are documented to support" the restrictions and limitations placed on Plaintiff's behavior by Dr. Lee. (Id. at AR345.)  "Her subjective complaints are consistent with the diagnosis of [Chronic Fatigue Syndrome], but this condition is not associated with any laboratory or physical exam findings which would support functional limitation." (Id.)

15.   Defendant completed an "Employability Analysis" in October 2005, based on Dr. Tuthill's opinion, which identified twenty-four occupations that Plaintiff was qualified to perform given her medical condition. (See id. at AR296-337.)  The Analysis stated that it was based on "no noted restriction to full-time capacity" and "no restriction to a seated-type or light-type function." (Id. at AR296.)

16.   Defendant terminated Plaintiff's disability benefits claim in November 2005. (Id. at AR155-159.)

17.   Plaintiff appealed Defendant's decision in May 2006. (Id. at AR291.)

18.  Dr. Lee submitted a "Complete Medical Report" as part of Plaintiff's appeal of Defendant's termination decision.  (See id. at AR268-76.)  Dr. Lee diagnosed Plaintiff with Chronic Fatigue Syndrome and Grave's Disease.  (Id. at AR272.)  Dr. Lee stated that a physical exam revealed Grave's Disease and "trigger points over arms, legs [and] back," but lab reports were normal.  (Id. at AR272.)  Dr. Lee noted that Plaintiff showed "[s]ome improvement over the year but energy level still ~50% of normal, post exertional fatigue persists, myalgias present."  (Id.)  Dr. Lee opined: (1) Plaintiff can "occasionally" lift and carry items weighing up to twenty pounds, but cannot lift or carry these items "frequently" or "continuously" because "sustained activity [caused Plaintiff] increased fatigue, muscle and joint pains"; (2) during an eight hour workday, Plaintiff is able to sit for a maximum of one hour, stand for a maximum of one hour, and walk for a maximum of one hour (but she cannot walk for more than half an hour without interruption), and if she exceeds these limits Plaintiff experiences "increased fatigue, muscle and joint aches and pains"; (3) Plaintiff requires at least a ten minute a break every hour; (4) Plaintiff is able to "use" her right hand, left hand, right foot and left foot only occasionally because "[s]ustained use would result in increased fatigue, myalgias and arthralgias"; (5) Plaintiff may never "stoop," and may climb, balance, crouch, kneel or crawl only "occasionally"; (6) Plaintiff is able "occasionally" to reach, push, and pull, and is able "frequently" to handle, feel, and hear, but may not do so "continuously"; (7) Plaintiff's condition require her to avoid all exposure to heights, chemicals, noise, dust, temperature extremes, fumes, and vibrations, since these factors "[m]ake symptoms of chronic fatigue syndrome worse"; (8) when

8

Plaintiff's "symptoms of fatigue, pain increase[] [they] can also affect [Plaintiff's] cognitive functioning [including] memory, multitasking [and] concentration." (Id. at AR273-76.)

19. Defendant obtained an independent medical report from Dr. James Bress ("Dr. Bress") (Id. at AR212-215.) Dr. Bress, who Defendant retained to conduct an independent medical record review during Plaintiff's appeal of Defendant's decision to terminate Plaintiff's benefits, based his opinion on Plaintiff's medical records, the surveillance evidence, the interview report from Defendant's investigator, and a conversation with Dr. Lee. (Id. at AR236.) Dr. Bress noted that Plaintiff made an "internally contradictory statement" during the in-home interview. (Id. at AR241.) Plaintiff said, "I am able to sit for 15 minutes. After that, my body is stiff and achy." (Id. at AR403.) But Plaintiff also stated she "can drive for approximately an hour before [she] has to stop and rest because [she becomes] stiff." (Id. at AR404.) Dr. Bress opined "[t]here is no support for Dr. Lee's restriction that [Plaintiff] could only function three hours per day. . . . She sat through a 6-3/4 hour interview with no cognitive dysfunction and with no evidence of pain although she did change position frequently." (Id. at AR242.) Dr. Bress concluded that, based on Plaintiff's ability to endure the interview and her ability to drive for an hour before becoming stiff, Plaintiff "is capable of full-time sedentary work . . ., sitting six hours of an eight hour day . . . [and] chang[ing] position at least once per hour." (Id. at AR240.)

20. Defendant completed a second "Employability Analysis" in September 2006, based on Dr. Bress's opinion. (Id. at AR222-35.)

1 This report identified four potential sedentary occupations Plaintiff
2 would be capable of performing.  (See id.)

3      21.  Defendant denied Plaintiff's appeal in September 2006.
4 (Id. at AR247-55.)

5      22.  While Dr. Lee examined and treated Plaintiff
6 first-hand, neither Dr. Tuthill nor Dr. Bress personally examined or
7 interviewed Plaintiff.  (Id. at AR342, AR236.)

8                    CONCLUSIONS OF LAW
9 I. Definition of "Totally Disabled"

10      Plaintiff contends that she is entitled to disability
11 benefits if her condition meets the California law definition of
12 "totally disabled." (Pl.'s Mot. at 16:27-17:21.)  Defendant counters
13 that the California law definition is irrelevant since the Policy's
14 definition of "totally disabled" applies in this ERISA action.
15 (Def.'s Opp'n at 7:1-8:10.)  "Under ERISA, state law does not control
16 the construction of the [benefits] policy."  McClure v. Life Ins. Co.
17 of N. Am., 84 F.3d 1129, 1133 (9th Cir. 1996).  Therefore, Plaintiff
18 must demonstrate she is "totally disabled" under the definition in the
19 Policy.  See Tavor v. Aetna Life Ins. Co., 2008 WL 622019, at *8 (D.
20 Ariz. March 4, 2008) (applying ERISA plan's definition of disability
21 instead of state law definition) (citing Madden v. ITT Long Term
22 Disability Plan for Salaried Employees, 914 F.2d 1279, 1286 n.6 (9th
23 Cir. 1990)).

24 II. Plaintiff's Request to Strike Dr. Bress's Opinion

25      Plaintiff argues Dr. Bress's opinion should be stricken from
26 the record because it was completed "without authority and is an
27 apparent violation" of the Health Insurance Portability and
28 Accountability Act of 1996 ("HIPAA").  (Pl.'s Mot. at 19:22-27.)

Plaintiff contends there was no authority because on April 28, 2006, she "withdrew the medical authorization [that had been] previously extended" to Defendant.  (Id. at 19:28-20:1; see Admin. Record at AR293.)  Dr. Bress did not conduct his review of Plaintiff's medical records until September 8, 2008.  (Admin. Record at AR236.)

Defendant counters it did not violate HIPAA when it provided Plaintiff's medical information to Dr. Bress since Defendant is not a "covered entity" under HIPAA.  (Def.'s Opp'n at 2:20-5:9.)  The HIPAA disclosure of confidential information provision applies only to "covered entities," and Defendant is not a "covered entity." See 45 C.F.R. § 160.103 (defining "covered entity" as a "health plan," a "health care clearinghouse," or "health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter"); id. § 164.512 (confidential information provision of HIPAA applies only to "covered entities").

Further, Defendant argues Dr. Bress's conversation with Dr. Lee (during which Dr. Bress obtained Plaintiff's confidential medical information from Dr. Lee) did not violate HIPAA since Plaintiff's attempt to revoke her authorization was not effective.  (Def.'s Opp'n at 2:20-5:9.)  In a document signed on July 25, 2005, Plaintiff authorized her physicians to disclose her confidential medical information to Defendant.  (See Admin. Record at AR412.)  This authorization states it expires two years from the date it is signed, and also acknowledges that information disclosed pursuant to the authorization "may no longer be protected by" HIPAA.  (Id.)  Although the authorization gives Plaintiff the right to revoke it, the authorization states Plaintiff's revocation will not be effective to the extent Defendant "has the right to contest [Plaintiff's] . . .

11

claim under the policy." (Id.)  Plaintiff attempted to revoke her

authorization after she initiated her appeal of Defendant's

termination decision.  (Id. at AR293.)  If Plaintiff's revocation were

effective, Defendant would be forced to act on Plaintiff's appeal

while "in the vulnerable position of being unable to further

investigate [Plaintiff's] eligibility for benefits."  (Def.'s Opp'n at

4:17-18.)  Plaintiff has not shown that her revocation was effective

under these circumstances.  Accordingly, Dr. Bress's opinion will be

considered.[2]

## III. Was Plaintiff "Totally Disabled" Under the Policy?

### A. Plaintiff's Evidence of Disability

Plaintiff contends she has demonstrated she is "totally

disabled" under the Policy because of her Chronic Fatigue Syndrome

condition.[3]  (Pl.'s Mot. at 19:8-15.)

---

[2]    Plaintiff proffers evidence that Defendant sent a letter to a
different disability insurance claimant stating that Defendant is "not
able to release the medical record in [the claimant's] claim file" to
an independent medical record reviewer since the claimant had revoked
her authorization.  (See Decl. of David Allen in Supp. of Pl.'s Rule 52
Mot. for J., Ex. 1.)  Defendant moves to strike this evidence.  In light
of the ruling on Plaintiff's request to strike, Defendant's motion to
strike need not be decided.

[3]    Plaintiff contends she also suffers from Grave's Disease and
fibromyalgia.  (Pl.'s Opp'n at 10:12-22.)  Dr. Tuthill noted that
although fibromyalgia "is mentioned as a diagnosis in the record, [but]
there is no documentation that [the] rheumatologic criteria for
[fibromyalgia] have been demonstrated [and therefore] [t]he record does
not support limitations as a result of [fibromyalgia]." (Admin. Record
at AR344.)  Further, Dr. Tuthill reported that Plaintiff's Grave's
Disease "has been successfully treated, and does not cause physical
limitations that preclude full time work." (Id.)  Although Plaintiff
contends the lingering effects of Grave's Disease make her eyes itchy,
Plaintiff offers insufficient evidence that she was actually formally
diagnosed with fibromyalgia or that her Grave's Disease caused her to be
"totally disabled."   (See id. at SIU066.)

12

1    There is no generally accepted clinical test used to

2 determine whether a patient has Chronic Fatigue Syndrome.  <u>Friedrich</u>

3 <u>v. Intel Corp.</u>, 181 F.3d 1105, 1112 (9th Cir. 1999).  The Ninth

4 Circuit has observed:

5          Chronic [F]atigue [Syndrome] is defined as
           "self-reported persistent or relapsing fatigue
6          lasting six or more consecutive months."
           Although [Chronic Fatigue Syndrome] is
7          accompanied by symptoms such as body aches,
           low-grade fevers, memory problems, headaches, and
8          extended flu-like symptoms, . . . **the presence of
           persistent fatigue is necessarily self-reported.**
9          The final diagnosis is made "by exclusion," or
           ruling out other possible illnesses.

10

11 <u>Reddick v. Chater</u>, 157 F.3d 715, 726 (9th Cir. 1998) (emphasis added)

12 (reversing administrative law judge's denial of Social Security

13 benefits where judge discounted treating physician's opinion for

14 relying on subjective complaints of chronic fatigue syndrome) (quoting

15 Centers for Disease Control, The Chronic Fatigue Syndrome: A

16 Comprehensive Approach to its Definition and Study, 121 Annals of

17 Internal Medicine 954 (1994)).  "[S]ubjective evidence of [Plaintiff's

18 disability], based on her own testimony and the medical reports of

19 examining physicians, is more than ample to establish her disability

20 . . . ."  <u>Krizek v. Cigna Group Ins.</u>, 345 F.3d 91, 102 (2d Cir. 2003)

21 (reversing and remanding district court's judgment for insurer on de

22 novo review of denial of ERISA disability benefits) (quoting <u>Marcus v.</u>

23 <u>Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979)).

24    Plaintiff stated she has four bad days during each week, and

25 on a bad day she is "too exhausted to go out and [she] stay[s] home

26 all day."  (Admin. Record at AR405.)  Plaintiff also stated "[she] is

27 not able to do any kind of work for a whole day without it being

28 interrupted by [her] lack of energy."  (<u>Id.</u> at AR406.)

1    Dr. Lee opines Plaintiff is not capable of performing a

2  full-time occupation because of her Chronic Fatigue Syndrome; she is

3  capable of only three hours of activity per day.  (See id. at

4  AR268-76.)  Dr. Lee also opines Plaintiff is incapable of sustained

5  activity, since any sustained activity causes Plaintiff increased

6  fatigue, muscle and joint pains.  (Id. at AR273-76.)  Further, Dr. Lee

7  opined that when Plaintiff's "symptoms of fatigue, pain increase[]

8  [they] can also affect [Plaintiff's] cognitive functioning [including]

9  memory, multitasking [and] concentration."  (Id. at AR273-76.)

10    Defendant argues Dr. Lee's opinions "do not support

11  Plaintiff's disability" because his opinions "are based solely on

12  Plaintiff's subjective complaints."[4]  (Def.'s Mot. at 9:27-10:1.)

13  Defendant contends that Dr. Lee's opinion is undermined since Dr. Lee

14  fails to report any "objective evidence of [P]laintiff's inability to

15  perform a full-time sedentary occupation."  (Def.'s Opp'n at 12:7-8,

16  13:8-9.)  Defendant argued at oral argument that Dr. Lee could have

17  included "observations" in his report that would have formed an

18  objective basis for his opinion.  Although Dr. Tuthill stated in his

19  _____

20    [4]    Defendant cites case law to support its position that it is
    entitled to demand "objective evidence" of Plaintiff's limitations.
21  (See Def.'s Opp'n at 10:18-14:18.)  However, the cases Defendant cites
    reviewed the plan administrator's decision under an abuse of discretion
22  standard, not under the de novo standard of review at issue here.  See
    Beamish v. The Hartford/The Hartford Fin. Servs. Group, Inc., 487 F.
23  Supp. 2d 1196, 1205 (W.D. Wash. 2007) (abuse of discretion standard);
    Jordan v. Northrop Grumman Corp. Welfare Ben. Plan, 63 F. Supp. 2d 1145,
24  1159 (C.D. Cal. 1999) (abuse of discretion standard); Voight v.
    Metropolitan Life Ins. Co., 28 F. Supp. 2d 569, 578 (C.D. Cal. 1998)
25  (abuse of discretion standard); Martin v. Continental Cas. Co., 96 F.
    Supp. 2d 983, 994 (N.D. Cal. 2000) (abuse of discretion standard);
26  Williams v. Aetna Life Ins. Co., 509 F.3d 317, 322 (7th Cir. 2007)
    (arbitrary and capricious standard); Boardman v. Prudential Ins. Co. of
27  Am., 337 F.3d 9, 16 n.5 (1st Cir. 2003); Pralutsky v. Metropolitan Life
    Ins. Co., 435 F.3d 833, 838 (8th Cir. 2006) (abuse of discretion
28  standard).

report that Dr. Lee "provides no specific observations that support a limitation of physical function," there is no evidence in the administrative record revealing what observations Dr. Lee should have included in his report. (Admin. Record at AR345.)  Therefore, Defendant's position on this point is not persuasive.

Dr. Bress highlighted in his report that Plaintiff had made a contradictory statement about her capabilities:  Plaintiff said, "I am able to sit for 15 minutes.  After that, my body is stiff and achy." (Id. at AR403.)  But Plaintiff also stated she "can drive for approximately an hour before [she] has to stop and rest because [she becomes] stiff." (Id. at AR404.)  However, any contradiction between these two statements is not sufficiently meaningful to call into question the credibility of Plaintiff's subjective complaints and Dr. Lee's reliance on those complaints.

B. Surveillance Evidence

Defendant argues the surveillance and in-home interview conducted by Defendant's investigators undermines Plaintiff's subjective complaints and Dr. Lee's opinion and "demonstrate that [P]laintiff has the functional capacity to perform a full-time sedentary occupation . . . ." (Def.'s Opp'n at 16:15-17.)  Plaintiff counters this evidence does not show she is able to perform a full-time sedentary occupation because she has good days and bad days, and her observed activities and the interview took place on a good day. (Admin. Record at AR084, AR088.) Plaintiff stated she has good days and bad days each week. (Id. at AR405.)

"Daily household chores and grocery shopping are not activities that are easily transferable to a work environment, 'where it might be impossible to periodically rest or take medication.'"

1  Blau v. Astrue, 2008 WL 152608, at *1-2 (9th Cir. Jan. 17, 2008)
2  (holding administrative law judge improperly denied plaintiff social
3  security benefits for Chronic Fatigue Syndrome) (quoting Fair v.
4  Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  Surveillance evidence
5  which depicts a plaintiff "walking driving and doing errands . . . for
6  a couple of hours . . . does not mean that [that p]laintiff is able to
7  work an eight-hour a day job . . . . Nor is sitting attentively for
8  four hours while being interviewed . . . the equivalent of working on
9  a full-time basis." Thivierge v. Hartford Life & Accident Ins. Co.,
10 2006 WL 823751, at *11 (N.D. Cal. March 28, 2006).  Surveillance
11 evidence which is consistent with a plaintiff's explanation that she
12 "periodically has good days" does not disprove that the plaintiff is
13 totally disabled. Cherry v. Digital Equip. Corp., 2006 WL 2594465, at
14 *9 (E.D. Cal. Sept. 11, 2006).
15         On a good day, Plaintiff is able to leave her house and run
16 errands, but on a bad day Plaintiff stays home and rests because she
17 is so fatigued. (Admin. Record at AR405.)  Defendant's surveillance
18 evidence is consistent with Plaintiff's statements, since on two of
19 the five days surveillance was conducted Plaintiff remained in her
20 home all day. (Id. at AR087.)  Plaintiff's statement that she is able
21 to perform more tasks on her "good days" but must recuperate on her
22 "bad days" is generally consistent with the sporadic nature of Chronic
23 Fatigue Syndrome. (Id. at AR405.)  Further, Plaintiff's activities
24 depicted in the surveillance evidence do not meaningfully contradict
25 Dr. Lee's opinion on Plaintiff's capacity to perform a full-time job.
26 (See id. at AR273-76.)  The surveillance only shows Plaintiff
27 conducting limited errands during a few hours in the afternoon each
28 day. (See id. at AR135-147.)  None of Plaintiff's documented

activities consumed a substantial part of her day or required extended periods of concentration.  (See id.)  Under the circumstances, the evidence that on one of her "good days" Plaintiff was able to drive to the store, visit a friend, carry a small bag, or sit through an interview while taking numerous breaks does not demonstrate Plaintiff would be able to perform a full-time sedentary job.  (See id. at AR087, AR137-47, AR398-406.)  Accordingly, Plaintiff has shown that Defendant's surveillance and interview evidence does not contradict the evidence that Plaintiff is totally disabled and unable to perform a full-time job.

    C. Volunteering, Bicycling and Computer Classes

       Defendant argues that Plaintiff's other activities, which were taking computer classes, bicycling with her granddaughter and volunteering at a hospital gift shop support its position that Plaintiff is able to perform a full-time sedentary job.  (Def.'s Opp'n at 15:2-14.)  Plaintiff counters that her other activities do not reveal that she "is without symptoms, or can work full time." (Pl.'s Opp'n at 7:27-28.)

       "[Chronic Fatigue Syndrome] does not disable an individual afflicted with it from performing particular, isolated activities, but rather prevents [the person] from performing all activities for any prolonged period of time." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 441 n.7 (3d Cir. 1997).  Therefore, "the ability to do sedentary work for short periods of time does not establish the ability to perform full-time, consistent work." Cherry, 2006 WL 2594465 at *8. Further, while someone disabled with Chronic Fatigue Syndrome may be able to work for short periods of time or on limited days of the week,

1  "A full-time employer cannot handle . . . inconsistent attendance and

2  unpredictability." <u>Thivierge</u>, 2006 WL 823751 at *13.

3      Plaintiff was "consistently absent" from her limited

4  volunteer position "due to health reasons." (Admin. Record at AR277.)

5  Plaintiff's supervisor at the hospital gift shop stated that

6  Plaintiff's absences were "tolerated because of her volunteer status,

7  [and] would not [have been] acceptable if she were working . . . in a

8  paid position." (<u>Id.</u>)  Further, Plaintiff's volunteering and computer

9  classes were not activities sustained for an eight hour workday. (<u>Id.</u>

10  at AR084, AR277.)  Likewise, the administrative record shows a single

11  incident of Plaintiff bicycling with her granddaughter, and the

12  evidence shows that this activity ended when Plaintiff fell and broke

13  her foot. (<u>Id.</u> at AR388.)  Accordingly, Plaintiff has shown her

14  volunteer activities, computer classes and bicycle riding incident

15  were isolated and limited activities which do not demonstrate a

16  capacity to work full-time.

17      D. Defendant's Medical Records Reviews

18      Defendant contends the record does not support a finding

19  that Plaintiff is totally disabled since "Dr. Tuthill and Dr. Bress

20  both opined, based on the evidence in the record, that [P]laintiff is

21  capable of performing a full-time sedentary occupation." (Def.'s Mot.

22  at 15:7-9.)  Defendant also argued at oral argument that Dr. Ando's

23  opinion shows Plaintiff is not totally disabled.  Plaintiff contends

24  that Dr. Tuthill's and Dr. Bress's opinions do not show Plaintiff is

25  able to perform a full-time sedentary job since they "disregard[ed]

26  the comments made by the attending physician," Dr. Lee.  (Pl.'s Mot.

27  at 19:22-23.)

28

1    "On de novo review, a district court may, in conducting its

2   independent evaluation of the evidence in the administrative record,

3   take cognizance of the fact . . . that a given treating physician has

4   a greater opportunity to know and observe the patient than a physician

5   retained by the plan administrator." Jebian v. Hewlett-Packard Co.

6   Employee Benefits Org. Income Protection Plan, 349 F.3d 1098, 1109

7   (9th Cir. 2003).  Therefore, "examining experts may be more persuasive

8   than those who merely review a paper record" since examining experts

9   have "had an opportunity to assess [a] plaintiff's veracity, [which

10  is] particularly important in assessing a condition for which there is

11  no laboratory diagnosis and that depends, in part, on self-reporting

12  of symptoms." Neumann v. Prudential Ins. Co. of Am., 367 F. Supp. 2d

13  969, 990 (E.D. Va. 2005) (holding that opinions of doctors who

14  examined patient and diagnosed her with fibromyalgia were more

15  persuasive than opinions of doctors who "never examined or interviewed

16  plaintiff, but merely reviewed her medical file").

17    Dr. Lee examined and treated Plaintiff first-hand; neither

18  Dr. Tuthill nor Dr. Bress personally examined or interviewed

19  Plaintiff.  (Admin. Record at AR342, AR236.)  Dr. Lee, as Plaintiff's

20  treating physician, had an opportunity to assess the veracity of

21  Plaintiff's subjective complaints of pain and fatigue.  Under the

22  circumstances, Dr. Lee's opinion, which is based on a personal

23  examination of Plaintiff and an assessment of her credibility, is more

24  persuasive than the opinions of Dr. Tuthill and Dr. Bress.[5]

25

26  _____

27    [5]   At oral argument, Defendant's counsel emphasized that Dr.
    Tuthill and Dr. Bress were "board certified," but was unable to show
28  evidence in the administrative record that illuminated what significance
    this certification should be afforded.

19

1    Dr. Ando's opinion is likewise less persuasive than Dr.

2  Lee's opinion.  It is not clear from the administrative record why Dr.

3  Ando was examining Plaintiff or the effect of Dr. Ando's opinion.

4  (See id. at AR623-48.)  Further, although Dr. Ando opined that

5  Plaintiff has "no limitations for sitting, walking, standing or

6  specific physical activities," Dr. Ando does not provide an opinion on

7  whether Plaintiff is totally disabled from any full-time occupation.

8  (See id. at AR627.)

9    Accordingly, "the two doctors who reviewed Plaintiff's

10  records, and did not examine Plaintiff, offered no convincing evidence

11  to show that Plaintiff could work an eight-hour day, even at a

12  sedentary job." Thivierge, 2006 WL 823751 at *11.

13  E. Employability Analyses

14    Defendant argues the Employability Analyses it conducted

15  reveals full-time occupations Plaintiff would be capable of

16  performing, and therefore Plaintiff is not entitled to disability

17  benefits.  (Def.'s Opp'n at 20:10-21:4.)  Plaintiff counters that the

18  Employability Analyses are erroneous because they are based on Dr.

19  Tuthill's and Dr. Bress's opinions, not Dr. Lee's.  (Pl.'s Opp'n at

20  8:22.)  The first Employability Analysis stated that it was based on

21  "no noted restriction to full-time capacity" and "no restriction to a

22  seated-type or light-type function." (Admin. Record at AR296.)  It is

23  unclear from the administrative record on what restrictions or

24  limitations the second Employability Analysis is based.  (See id. at

25  AR222-35.)

26    Dr. Lee opined that Plaintiff is capable of only three hours

27  of sustained activity per day, and Plaintiff states that on her bad

28  days she is unable to leave the house because of her fatigue.  The

jobs described in the Employability Analyses would each require more stamina than Dr. Lee believes Plaintiff is capable since the jobs identified are full-time occupations.  (See id. at AR273-74, AR083.) Since Plaintiff has shown that Dr. Lee's opinion should be credited, the Employability Analyses does not reveal Plaintiff is not "totally disabled."

### F. Social Security Administration

Plaintiff contends the Social Security Administration's finding that she is disabled supports her claim that she is "totally disabled" under the Policy.  (Pl.'s Mot. at 5:17-6:15.)  Defendant counters that whether Plaintiff is disabled for purposes of receiving Social Security benefits is irrelevant to whether Plaintiff is "totally disabled" under the Policy.  (Def.'s Opp'n at 5:12-6:26.) "While the [Social Security Administration] decision is not binding on [Defendant], and [Defendant] may legitimately come to a different conclusion, the [Social Security Administration] determination may still be considered as evidence of [Plaintiff's] disability." Whealen v. Hartford Life & Accident Ins. Co., 2007 WL 1891175 (C.D. Cal. June 28, 2007) (citing Wible v. Aetna Life Ins. Co., 375 F. Supp. 2d 956, 971 (C.D. Cal. 2005).  This evidence supports Plaintiff's position that she is "totally disabled" under the Policy.

### IV. Attorney's Fees

Plaintiff requests attorney's fees incurred in litigating this action.  (Pl.'s Mot. at 23:18-26:25.)  Defendant counters Plaintiff should not be awarded fees.  (Def.'s Opp'n at 24:22-25:17.)

In ERISA actions to recover unpaid disability benefits, prevailing plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."

1  <u>Smith v. CMTA-IAM Pension Trust</u>, 746 F.2d 587, 589 (9th Cir. 1984).
2  In determining whether to award fees, the following "<u>Hummell</u>" factors
3  are considered: (1) "the degree of the [] parties' culpability or bad
4  faith," (2) the relative abilities of the parties to satisfy a fee
5  award, (3) "whether an award of fees against the opposing parties
6  would deter others from acting in similar circumstances," (4) whether
7  Plaintiff sought to benefit all plan participants or to "resolve a
8  significant legal question regarding ERISA," and (5) "the relative
9  merits of the parties' positions." <u>Id.</u> at 590 (quoting <u>Hummell v.</u>
10  <u>S.E. Rykoff & Co.</u>, 634 F.2d 446, 453 (9th Cir. 1980)).

11       "Because an employee's resources are generally limited, []
12  and ERISA is intended to afford plan participants effective access to
13  the courts, the ability of the defendant to satisfy an award of fees
14  is a key factor." <u>Fleming v. Kemper Nat'l Servs., Inc.</u>, 373 F. Supp.
15  2d 1000, 1005 (N.D. Cal. 2005). "Based on this factor alone, absent
16  special circumstances, a prevailing ERISA employee plaintiff should
17  ordinarily receive attorney's fees from the defendant." <u>Smith</u>, 746
18  F.2d at 590.

19       Defendant presents no evidence suggesting it is unable to
20  satisfy a fee award. Further, Plaintiff argues an award of attorney's
21  fees may deter Defendant from improperly withholding disability
22  insurance payments from other insureds in the future. (Pl. Mot. at
23  25:17-24.) Accordingly, Plaintiff has shown she is entitled to
24  recover reasonable attorney's fees.

25  <u>V. Prejudgment Interest</u>

26       Plaintiff requests prejudgement interest. Whether to award
27  prejudgment interest "is a question of fairness, lying within the
28  court's sound discretion, to be answered by balancing the equities."

1  Shaw v. Int'l Ass'n of Machs., 750 F.2d 1458, 1459 (9th Cir. 1985).

2  "The equities weigh in Plaintiff's favor" since "without prejudgment

3  interest, Plaintiff is not made whole."   Peterson v. Federal Express

4  Corp. Long Term Disability Plan, 525 F. Supp. 2d 1125, 1130 (D. Ariz.

5  2007); see also Cherry, 2006 WL 2594465 at *10 (concluding that ERISA

6  plaintiff was entitled to prejudgment interest since "[if] [plaintiff]

7  simply received the amount of [the] disability benefits [due her]

8  without prejudgment interest, she would not be compensated for the

9  lateness of the payments").

10          The parties dispute the applicable interest rate.  "[T]he

11  interest rate prescribed for post-judgment interest under 28 U.S.C. §

12  1961 is appropriate for fixing the rate of pre-judgment interest

13  'unless the trial judge finds, on substantial evidence, that the

14  equities of that particular case require a different rate.'"   Nelson

15  v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1391 (9th

16  Cir. 1994) (quoting W. Pacific Fisheries, Inc. v. S.S. President

17  Grant, 730 F.2d 1280, 1289 (9th Cir. 1984)).  Section 1961 provides

18  that the interest rate shall be equal to "the coupon issue yield

19  equivalent (as determined by the Secretary of the Treasury) of the

20  average accepted auction price for the last auction of fifty-two week

21  United States Treasury bills settled immediately prior to the date of

22  the judgment."  28 U.S.C. § 1961.

23          Plaintiff argues the Treasury bill interest rate in effect

24  at the time payment was due Plaintiff should be applied.  Defendant

25  rejoins that the Treasury bill interest rate in effect at the time

26  judgment is entered should be applied.  (Pl.'s Mot. at 27:2-22; Def.'s

27  Opp'n at 26:4-5.)  In Nelson, the Ninth Circuit applied Section 1961

28  to determine what Treasury bill interest rate was applicable, and held

that the pertinent rate was the Treasury bill interest rate in effect
at the time payment should have been made.  37 F.3d at 1391-92 ("It is
the Treasury bill rate [at the time payment should have been made]
that is pertinent, not the Treasury bill rate at the time of judgment
[since] [t]he Treasury bill rate at the time of judgment has no
bearing on what could have been earned prior to judgment."); see also
Fleming, 373 F. Supp. 2d at 1013 (applying the Treasury bill rate
"that was in effect at the time payment was due to the plaintiff, not
the rate applicable as of the date of judgment").

        Accordingly, Plaintiff is entitled to pre-judgment interest,
and the applicable interest rate for each disability insurance payment
that should have been made to Plaintiff is the Treasury bill rate
under Section 1961 that was in effect at the time each payment should
have been made.

CONCLUSION

        Plaintiff has shown by a preponderance of the evidence that
she is entitled to disability benefits since she is "totally disabled"
under the Policy.  Accordingly,

        (1) Plaintiff's Rule 52 motion is granted and Defendant's
Rule 52 motion is denied.  Judgment on the administrative record shall
be entered in favor of Plaintiff.  Plaintiff shall recover all
benefits to which she was entitled under the Policy from the date such
benefits were terminated in November 2005 to the present.

        (2) Plaintiff's requests for attorney's fees and prejudgment
interest are granted.  The rate of prejudgment interest shall be
determined individually for each benefit payment according to the
average accepted auction price for the last auction of fifty-two week
United States Treasury bills settled immediately prior to the date

each of her withheld benefit payments became due, pursuant to 28

U.S.C. § 1961(a).

       (3) The parties shall jointly submit, no later than thirty

days from the date this order is filed, a proposed judgment, or, in

the event they are unable to agree on the amount or form of judgment,

to submit a joint statement setting forth therein each party's

proposed judgment and the reasons for any differences.

       IT IS SO ORDERED.

Dated:  April 23, 2008

_____
GARLAND E. BURRELL, JR.
United States District Judge